**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JOHN WILLIAM BIRD,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:15-CV-0063-BH** |
| | § | |
| **CAROLYN COLVIN, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Consent** |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated March 11, 2015 (doc. 14), this case has been transferred for the conduct of all further proceedings and the entry of judgment.  Before the Court are *Plaintiff's Brief on Review of the Social Security Administration's Denial of Benefits,* filed April 10, 2015 (doc. 16), *Defendant's Response Brief in Support of the Commissioners Decision*, filed May 1, 2015 (doc. 17), and *Plaintiff's Reply to the Commissioner's Brief* (doc. 18).  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I.   BACKGROUND[1]

### A.    Procedural History

John William Bird (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act) and supplemental security income (SSI) under Title XVI of

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

the Act.  On March 18, 2011, and September 13, 2011, Plaintiff filed his applications for disability benefits under Title XVI and Title II of the Act, respectively, alleging disability beginning on May 10, 2011. (R. at 37.)  He later amended his onset of disability to July 22, 2011. (R. at 39.)  Plaintiff's claims for disability were initially denied on January 27, 2012, and upon reconsideration on June 8, 2012. (R. at 109, 113.)  On July 2, 2012, he requested a hearing before an administrative law judge (ALJ), (R. at 124), and he appeared and testified at a hearing on December 13, 2013, (R. at 54).  The ALJ denied Plaintiff's applications on December 18, 2013, finding him not disabled. (R. at 34-48.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council and submitted new evidence, which consisted of medical records from Allied Mental Health Consultants (Allied) and Pecan Valley Mental Health and Mental Retardation (Pecan Valley). (R. at 8-33, 966-87.)  The Appeals Council denied his request for review on November 14, 2014.  (R. at 1, 5.) Plaintiff timely appealed the Appeals Council's decision under 42 U.S.C. § 405(g).

## B.    Factual History

### 1.    Age, Education, and Work Experience

Plaintiff was born on August 13, 1958, and was 55 years old at the time of the hearing.  (R. at 64.)  He completed the ninth grade and could read and write in English but had not earned a G.E.D. (R. at 74, 247.)  He had past relevant work as an electroplating laborer, plater, stocker, third shift manager, production supervisor, and quality assurance monitor. (R. at 93.)

### 2.    Medical Evidence[2]

On August 20, 2010, Plaintiff was seen at the Tarrant County Hospital, Department of

_____

[2] Because Plaintiff raises only issues related to his mental impairments, only the medical evidence pertaining to a mental impairment is summarized.

Psychiatry (Tarrant Psychiatry) by Tate Rubley, PA-C[3] who performed a comprehensive mental status evaluation. (R. at 428-435.) Plaintiff reported that he often got into fights and was sexually abused in the past. (R. at 430.)  Mr. Rubley noted that he appeared neat, had good eye contact, and had normal movements. (*Id.*)  His mood was eurythmic and affect appropriate, he was alert and oriented to time, person, and place, and he had fair concentration and intact memory. (*Id.*) His thought processes were well organized and goal-oriented, and he exhibited good judgment. (*Id.*) He appeared hyperactive and had a rapid and pressured speech rate, however. (*Id.*) Mr. Rubley recommended Plaintiff continue taking Effexor, eat a regular diet, and return to the "least restrictive care environment." (R. at 433.)

On May 3, 2011, Plaintiff returned to the Tarrant Psychiatry. (R. at 443-44.)  His mood was mildly depressed, and he was diagnosed with mood disorder. (*Id.*)  His Effexor prescription was refilled. (R. at 444.)  On October 18, 2011, Plaintiff was alert and oriented to person, place, and time. (R. at 495.)  His mood was euthymic and affect appropriate. (*Id.*)  His general behavior was cooperative and his speech rate was normal.  (*Id.*)  He was diagnosed with recurrent major depressive disorder.  (R. at 496.)

On December 16, 2011, Plaintiff had a physical examination with state agency consultant Anuradha Tavarekere, M.D. (R. at 551-54.)  He reported taking Plavix, aspirin, Lipitor, Dilantin, magnesium oxide, lisinopril, Effexor, and Toprol. (R. at 552.) Dr. Tavarekere noted Plaintiff's history was suggestive of bipolar disorder. (R. at 554.)

On January 19, 2012, Charles Lankford, Ph.D., performed both a mental residual functional capacity (RFC) assessment and a psychiatric review of Plaintiff. (R. at 558, 562.)  In the mental

---

[3] Physician Assistant, Certified.

RFC, Dr. Lankford rated Plaintiff as either "not significantly limited" or "moderately limited" in all categories. (R. at 558-61.)  Dr. Lankford concluded that he can understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, and respond appropriately to changes in routine settings. (R. at 560.) In his psychiatric review, Dr. Lankford stated he had a medically determinable impairment of "mood disorder [not otherwise specified]." (R. at 565.) He exhibited mild limitations in his daily living activities and in maintaining concentration, persistence, or pace.  (R. at 572.)  He also exhibited moderate limitations in social functioning, but no degree of limitation in episodes of decompensation. (*Id.*)  Dr. Lankford concluded that the allegations of depression and "problems with thinking and concentration" were "not fully supported by the evidence on record." (R. at 574.)

A second psychiatric review was performed on May 23, 2012, by Steven Akeson, Psy.D.[4] (R. at 668-77.)  Dr. Akeson found that there were medically determinable impairments consisting of bipolar disorder, major depressive disorder, and mood disorder. (R. at 670.)  He found that Plaintiff had only mild limitations pertaining to his activities of daily living; maintaining social functioning; and maintaining concentration, persistence, and pace. (R. at 675.) He also found no degree of limitation regarding episodes of decompensation. (*Id.*) Ultimately, Dr. Akeson concluded Plaintiff's allegations were partially credible, but that his mental impairment appeared non-severe. (R. at 677.)

On December 27, 2012, Plaintiff visited Nevada Urgent Care, where lab reports revealed sub-therapeutic Dilantin levels. (R. at 767.) He stated that he forgot to take his medication due to his depression, was sleeping poorly, and had quit taking Wellbutrin. (*Id.*)  He returned to Nevada

---

[4]  Doctor of Psychology.

4

Urgent Care on several occasions, including January 3 and 24, 2013, and February 15, 2013. (R. at 764-66.) On each occasion, as he took his medication, his irritability, depression, and thought process improved. (*Id.*)

On May 1, 2013, Plaintiff returned to Nevada Urgent Care but could not recall why he was there. (R. at 745.) After a second incident on May 15 2013, he was diagnosed with short-term memory loss. (R. at 734, 738.)  On May 29, 2013, he reported no appreciable improvement in memory. (R. at 727.)  Nurse practitioner Deborah Asberry wrote that Plaintiff was "able to state [the] date, month, [and] recent holiday" and was "able to concentrate on financial calculating." (*Id.*) She noted that his problems related to issues that required planning or foresight, and that he struggled to find the right words when he spoke and frequently hesitated.  (*Id.*)  She diagnosed him with bipolar disorder and short-term memory loss. (R. at 732.)

On June 3, 2013, Plaintiff had an MRI of his brain to further investigate his short term memory issues. (R. at 709.) It was normal with some evidence of small vessel ischemic disease. (R. at 709, 719.)  He started receiving oxygen at two liters per minute while he slept. (R. at 719.)  Nurse practitioner Asberry recommended that he continue using the oxygen and consider Namenda if there was no improvement with memory issues. (R. at 725.)

### 3.     Hearing Testimony

On December 13, 2013, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 54-99.)  Plaintiff was represented by an attorney. (R. at 56.)

#### a.     *Plaintiff's Testimony*

Plaintiff testified that he was 55 years old, six feet tall, and weighed 194 pounds. (R. at 64.) He alleged that he became disabled on July 22, 2011, when he had bypass surgery. (R. at 65.) He

suffered from two heart attacks prior to that bypass surgery but continued working until at least May 10, 2010. (*Id.*)

From 2004-2010, Plaintiff worked for Bell Helicopter as a plater, which is a skilled trade. (R. at 66.) He had to first be an apprentice before becoming a journeyman, and he started his apprenticeship in 1978. (*Id.*) He did not have to go to school and received "on-the-job training." (R. at 67.) He was fired by Bell Helicopter because "[he had] problems with [his] temper" and had "gotten crossways with [his] supervisor" and a fellow employee." (R. at 78.)

Prior to working at Bell Helicopter, he was a quality inspector with Apache Enterprises for approximately nine months. (R. at 69.)  The position was full-time, and he would inspect machined parts. (R. at 70.)  Prior to Apache Enterprises, he was a stocker at Grocery Outlet for three to four months. (R. at 69.)  Before becoming a stocker for Grocery Outlet, he was a third shift manager for Artco-Bell, which manufactured school furniture, from March 2000 until July 2002. (R. at 70, 247.) He worked in a supervisory role over the plating department and other departments during the night shift. (R. at 71.) He had the ability to discipline employees but did not have the authority to hire or fire. (R. 71-72.)  Plaintiff did not fill out performance reviews of the employees, but he offered his input to those who did. (R. at 72.) He stopped working at Artco-Bell because "work had slowed down," and his wife wanted to move elsewhere. (R. at 73.)  Plaintiff worked as a plater for a metal finishing shop called Jar-Tex from 1982 until 2000. (R. at 70, 274).  He quit his job in 2000 because he did not "get along very well" with the new owner.  (R. at 70-72.)

At the time of the hearing, Plaintiff was taking Vitamin D3, Lipitor, Plavix, Symbicort, Albuterol, Metformin, Fenethylline, Ranitidine, and Effexor. (R. at 75-76, 78.)  He took Effexor to "slow [his] brain down . . . to where his mind wasn't racing." (R. at 91.) However, he felt the

medication "slowed [him] down a little bit too much." (*Id.*) He had a hard time understanding simple questions or doing simple tasks. (*Id.*) He did not use his recommended inhaler because he tried to do without it. (R. at 76.) He also admitted to smoking "a little bit." (R. at 77.)

Plaintiff saw a psychologist from Allied every two to three weeks to "talk about issues" and discuss how his medications were working. (R. at 79.) When asked why he thought he could not work five days a week, eight hours a day, Plaintiff responded that "everything actually started to go downhill" after "the last couple of heart attacks." (R. at 81.)  Specifically, he had shortness of breath, trouble sleeping, back pain, short-term memory difficulties, and difficulty lifting objects for prolonged periods of time. (R. at 82-84.)

The ALJ asked Plaintiff if he was able to keep track of a sports game, and he responded that he could. (R. at 83.) The ALJ asked him why he chose not to take pain medication, and he responded that he "just decided to deal with the pain." (R. at 82.) When prompted to explain his lifting abilities, he said he could carry three to five pounds and probably walk twenty-five or thirty feet with the weight before his back, legs, and arms started hurting. (R. at 84.)

Plaintiff testified that he could climb four to six stairs, but doing so caused his legs to ache. (R. at 85.) If he was not carrying anything, he could walk about fifty feet before his legs started to hurt or cramp.  (*Id.*)  He could stand anywhere from five to twenty minutes until he had to shift around or move.  (*Id.*)  Plaintiff's attorney asked him if he could stand long enough to complete a six hour work day if he had the option to switch from sitting to standing. (*Id.*) He responded that he did not know. (*Id.*)

Plaintiff stated he could sit for ten to twenty minutes before he needed to change positions or stand up. (R. at 91.)  He could wash dishes, but it usually took him two hours because he had to

stop frequently due to pain. (R. at 85.)  He had a short temper and became agitated easily. (R. at 87.)

Effexor used to work well in managing his moods, but its effectiveness had subsided. (R. at 88.)

Because of this, his mind raced and he had a quick temper. (*Id.*)  He had trouble recalling things

quite often. (R. at 90.) He had panic and anxiety problems occasionally. (*Id.*) He preferred not to be

around crowds and ran errands early in the morning so that he could avoid them. (R. at 90.)

### b.      VE's Testimony

The VE testified that Plaintiff had past relevant work as an electroplating laborer (500.686-010, heavy, SVP: 2), plater (500.380-010, medium, SVP: 7), stock clerk (299.367-014, heavy, SVP: 4), production supervisor (699.130-010, light, SVP: 7), and quality assurance monitor (806.367-018, light, SVP: 5). (R. at 93.) The VE opined that Plaintiff acquired skills from the quality assurance monitor position that transferred to sedentary work. (R. at 94.) The ability to discern quality from not quality parts was transferable, as was his ability to communicate, to work with people of diverse backgrounds, to make decisions, and to lead. (*Id.*)

The ALJ asked if "those types of skills transfer[red] to other occupations with little, if any, vocational adjustment in terms of tools, work processes, work settings or the industry." (R. at 95.) The VE responded that those skills easily transferred to a quality control supervisor position (559.134-010, sedentary, SVP: 4) which had 5,000 positions available in Missouri[5] and 100,000 in the U.S. economy. (*Id.*)

The ALJ asked the VE to consider a hypothetical person who had Plaintiff's past work experience and a ninth grade education.  The hypothetical person also was limited to sedentary work allowing for a sit/stand alternative; could not climb ramps, stairs, ladders or scaffolds; limited to

---

[5]  At the time of the hearing, Plaintiff was a resident of Missouri.

occasional balancing and stooping, but no kneeling, crouching, or crawling; limited to occasional exposure to extreme cold and heat; limited to no exposure to fumes, odors, dust, or gases, including cigarette smoke; and limited to no exposure to hazards such as unprotected heights and moving mechanical parts. The ALJ asked if that hypothetical individual could perform any of the past work. (R. at 95-96.) The VE opined that the hypothetical person could not perform the past work but could perform the quality control supervisor position. (R. at 96.)

The ALJ added that the individual would be limited to simple, routine, repetitive tasks consistent with unskilled work and stated that "the hypothetical individual could not perform the quality control supervisor" position because "there wouldn't be an occupational base."(R. at 97.) The VE agreed. (*Id.*) The ALJ lastly asked if hypotheticals one and two "were both consistent with the DOT." (R. at 98.) The VE replied that they were. (*Id.*)

Plaintiff's attorney asked the VE to refer to the first hypothetical and assume that the individual had to take five naps during the day, with an average of twelve minutes per nap. (R. at 97.) The ALJ interjected, "Are we talking about 25 percent off task?" The attorney responded "yes." (*Id.*) The attorney then proceeded to ask if the individual was 25 percent off task, "how would that affect their ability to maintain employment?" (R. at 98.) The VE responded it would not likely be allowed in the workplace, and the individual would not maintain employment. (*Id.*)

The attorney then added that the hypothetical person had problems with "occasional outbursts with either coworkers or supervisors" and asked how that might affect substantial gainful employment. (R. at 98.) The VE opined that it "would really depend on the accommodating ability of the employer," but in her professional opinion, "those are not to be taken likely [sic], and the individual would likely not maintain employment." (*Id.*)

C.    **The ALJ's Findings**

The ALJ issued his decision denying benefits on December 18, 2013.  (R. at 34.)  At step one,[6] he found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of July 22, 2011. (R. at 39.)  At step two, he found that Plaintiff had the following severe impairments: diabetes mellitus, coronary artery disease status post-bypass graft surgery with history of myocardial infarction, peripheral vascular disease, hypertension, chronic obstructive pulmonary disease, obstructive sleep apnea, and lumbar degenerative disc disease. (*Id.*) Despite those impairments, at step three, he found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (R. at 41.)  Next, the ALJ determined that Plaintiff had the following RFC: perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except he required a sit/stand alternating option, but could stay on-task while alternating between positions. He could not kneel, crouch, crawl, or climb ramps, stairs, ladders, and scaffolds and was limited to occasional balancing and stooping. He required no more than occasional exposure to extreme cold and heat, with no exposure to fumes, odors, dusts, gases, work environments with cigarette smoke, and poor ventilation. He was limited to no exposure to hazards such as unprotected heights and moving mechanical parts. (R. at 42.)  At step four, based on the VE's testimony, the ALJ found that Plaintiff could not perform past relevant work.  (R. at 46.)  The ALJ continued to step five and found that he had acquired work skills from his past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy. (R. at 47.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from his onset date through the

---

[6] A five-step analysis is used to determine whether a claimant is disabled under the Social Security Act, which is described more fully below.

date of decision.  (R. at 48.)

**D.** **New Evidence Submitted to the Appeals Council**

Plaintiff appealed the ALJ's decision to the Appeals Council and submitted new evidence with that appeal that consisted of medical records from Allied and Pecan Valley.[7] (R. at 966-87, 8-33.) The Appeals Council denied his request for review on November 14, 2014, but admitted the Allied records into the administrative record. (R. at 1, 5.) The Appeals Council declined to add the Pecan Valley records to the record because they were dated August 6, 2014 through September 9, 2014, which was a period of time after the ALJ's decision. (R. at 2.)

**1.** **Allied Medical Records**

The Allied records consisted of eleven sessions with Holly Chatain, Psy.D. (R. at 977-987.) On August 23, 2013, Plaintiff had an initial consultation with Dr. Chatain. (R. at 987.)  Dr. Chatain noted that his motor activity was slightly fidgety, his thought processes were somewhat tangential, his mood was depressed, and his affect was tearful. (*Id.*) Plaintiff appeared cooperative, and his memory functioning appeared intact. (*Id.*) Dr. Chatain diagnosed him with major depressive disorder and mild posttraumatic stress disorder. (*Id.*) She also assigned Plaintiff a Global Assessment of Functioning (GAF) score of 50. (*Id.*) Ultimately, Dr. Chatain opined that he "ha[d] a mental illness which prevent[ed] him from engaging in employment for at least six to twelve months." (*Id.*)

Plaintiff had a follow-up with Dr. Chatain on September 6, 2013. (R. at 984.) Dr. Chatian noted that he fidgeted in his seat and had tangential thought processes. (R. at 985.) She also noted, however, that he had good cooperation and his memory was intact. (*Id.*) She diagnosed Plaintiff with major depressive disorder and assigned a GAF score of 50. (*Id.*)

---

[7] Plaintiff also submitted records other than those from Pecan Valley and Allied that the Appeals Council incorporated into the record. (R. at 5.)  Because he only argued that the records from Allied and Pecan Valley are material, only those records are considered.

On September 27, 2013, Plaintiff had a follow-up session with Dr. Chatain. (R. at 982.) His mood was somber and "affect moderately restricted." He discussed life stressors such as personal conflicts with his wife. (*Id.*) On October 18, 2013, his mood was somber and "affect pensive." (R. at 981.) He continued to discuss problems with his spouse, and Dr. Chatain gave him advice on how to respond to conflict. (*Id.*) Dr. Chatain wrote that his progress was good and that he was motivated to implement positive changes in his life. (*Id.*)

On November 1, 2013, his mood was slightly agitated and "affect congruent." (R. at 980.) He discussed his struggle to control his anger and with knowing what was going on. (*Id.*) Dr. Chatain recorded that his progress was good and that he worked on regulating his temper. (*Id.*) On November 15, 2013, his mood was somber and "affect somewhat anxious." (R. at 979.) The focus of the discussion was on his health. They discussed quitting smoking, pursuing diabetes education, and implementing life changes. (*Id.*) By the end of the session, Plaintiff agreed to call a dietician and Medicaid about Chantix. (*Id.*)

On December 13, 2013, Plaintiff reported to Dr. Chatain that he was stressed about the upcoming social security hearing. (R. at 977.) The two discussed traumatic sexual abuse as a child and past personal alcohol and drug abuse. (*Id.*) Dr. Chatain observed his progress regressed somewhat due to the hearing stressor. (*Id.*) She again noted that his progress had regressed somewhat on January 10, 2014. (R. at 975.) His mood was depressed and "affect slightly agitated." (*Id.*) The two discussed Plaintiff's financial hardship and declining health. (*Id.*)

On February 14, 2014, Plaintiff's mood was depressed and "affect moderately restricted." (R. at 971.) Dr. Chatain praised him for quitting smoking and discussed with him "how to be mindful in the moment." (*Id.*) His progress was good even though he continued to struggle with

mood instability. (*Id.*) Likewise on March 7, 2014, Plaintiff reported that he quit smoking and that his spouse was attempting to as well. The discussion focused on his goal of eating better. (*Id.*) Overall, Dr. Chatain thought his progress was good. (*Id.*) On March 21, 2014, Dr. Chatain thought his progress was slow because he was "hesitant to disclose things." (R. at 969.) His mood was depressed and affect anxious. (*Id.*)

### 2.    Pecan Valley Medical Records

Plaintiff's initial visit at Pecan Valley occurred on August 6, 2014. (R. at 28.) He reported that he had nightmares and difficulty falling asleep. (R. at 30.) He also reported feelings of worthlessness and decreased ability to concentrate. (*Id.*) Britni Warren, M.S., L.P.C., Intake Coordinator, wrote that "just talking to the client during assessment you would think he was manic because of his flight of ideas and pressured speech." (R. at 29.)  Plaintiff was diagnosed with unspecified major depressive disorder and assigned a GAF score of 50. (R. at 31.)

Bird returned to Pecan Valley on August 11, 2014, where he met with case manager Shannon Reitan-Shaler, QMHP-CS[8] to discuss anxiety and frustration issues. (R. at 24.) Reitan-Shaler described him as having high energy with difficulty focusing on a single topic, causing him to be frustrated by the inability to accomplish simple goals or conversations. (*Id.*) During the second appointment, he displayed signs of anxiety, including rapid speech and switching topics. (R. at 23.) Reitan-Shaler set up an appointment with supervising psychiatrist, Dr. Srinivas Reddy, for further evaluation. (*Id.*)

On August 28, 2014, Plaintiff arrived at Pecan Valley wearing pajamas for his evaluation with Dr. Reddy. (R. at 15.) Ms. Reitan-Shaler recorded that he was very dramatic and became very

---

[8]  Qualified Mental Health Professional-Community Services.

emotional because he felt like he and his wife were being mistreated. She opined that he was very intelligent and was an excellent caregiver to his wife, but she also wrote that Plaintiff was "extremely hyper", which is a "major barrier when communicating how he reacts to stressful situations." (*Id.*) Dr. Reddy performed a psychiatric assessment and noted Plaintiff's behavior to be calm, speech normal, thought process normal, judgment intact, insight intact, recent memory intact, remote memory intact, and fund of knowledge intact. (R. at 17-18.)  His affect was appropriate but mood depressed. (R. at 18.)  Dr. Reddy diagnosed him with major depressive disorder and assigned him a GAF score of 50. (R. at 19.)

Plaintiff returned to Pecan Valley on September 9, 2011, and reported he was unable to work and felt work would jeopardize his eligibility for disability benefits. (R. at 10.) Ms. Reitan-Shaler observed that he had a blunted and depressed affect while reporting that he felt  like he was going to "lose [his] mind." (*Id.*)  She advised him to engage in skills training and continue treatment. (*Id.*)

## II.   ANALYSIS

### A.   Legal Standards

#### 1.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence

standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *Id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *Id.* at 436 and n.1.

### 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563-64.  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*,

770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.     An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.     An individual who does not have a "severe impairment" will not be found to be disabled.

3.     An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.     If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.     If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457,

461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

B.    **Issues for Review**

Plaintiff raises two issues for review:

(1)  When new evidence is submitted to the Appeals Council, remand is required when the evidence is "material," such that it 1) relates to the adjudicative time period and 2) would have changed the outcome. Was the new evidence that [Plaintiff] submitted to the Appeals Council material when it addressed [his] longstanding mental impairments and indicated work-related limitations attributable to [his] mental impairments?

(1)  When the evidence raises a suspicion of an additional impairment that affects the claimant's ability to work, the ALJ has a duty to fully and fairly develop the record. Did the ALJ fail to develop the record when he was informed of additional evidence regarding [Plaintiff's] mental impairments, yet he never ordered those records and ultimately concluded the claimant's mental impairments were non-severe?

(doc. 16 at 4.)

C.    **New Evidence**

Plaintiff argues that remand is required because "new and material evidence" contradicts the ALJ's findings and would have changed the outcome. (doc. 16 at 15, 21.)

When a claimant submits new and material evidence that relates to the period before the date of the ALJ's decision, the Appeals Council must consider the evidence in deciding whether to grant a request for review. 20 C.F.R. § 404.970(b). New evidence submitted to the Appeals Council becomes part of the record upon which the Commissioner's decision is based. *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005). A court considering the Appeals Council's decision must review the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence, and should remand only if the new evidence dilutes the record to such an

extent that the ALJ's decision becomes unsupported. *Higginbotham v. Barnhart*, 163 F. App'x 279, 281-82 (5th Cir. 2006); *Morton v. Astrue*, No. 3:10–CV–1076–D, 2011 WL 2455566, at *7 (N.D. Tex. June 20, 2011) (Fitzwater, C.J.) ("The proper inquiry concerning new evidence takes place in the district court, which considers whether, in light of the new evidence, the Commissioner's findings are still supported by substantial evidence.") (citations omitted).[9]

### 1.    Allied Mental Health

The Allied documents consist of a diagnostic assessment by Dr. Chatain on August 23, 2013 (R. at 987.), and treatment sessions with dated September 6, 2013 through March 21, 2014. (R. at 966-87.)  The Appeals Council considered and incorporated the documents into the record. (R. at 1, 5.)  It "found that this information [did] not provide a basis for changing the Administrative Law Judge's decision." (R. at 2.) The Commissioner concedes the Allied records are new, so the issue becomes one of materiality. (doc. 17 at 3.)

Evidence is material if: (1) it relates to the time period for which the disability benefits were denied; and (2) there is a reasonable probability that it would have changed the outcome of the disability determination. *Castillo v. Barnhart*, 325 F.3d 550, 551-52 (5th Cir. 2003) (per curiam). Evidence of a later-acquired disability or a subsequent deterioration of a non-disabling condition is not material. *Johnson v. Heckler*, 767 F.2d 180, 183 (5th Cir.1985).

Because the treatment notes pre-date the ALJ's decision on December 18, 2013, they meet the timing requirement.  (R. at 48, 966-87.)

---

[9]   Plaintiff contends that "this Circuit employs different legal standards concerning new evidence that is submitted to the Appeals Council." (doc. 18 at 2, 18 n.5.)  The proper analysis is whether the evidence is both new and material, and if it is, whether that new and material evidence dilutes the record to the extent that the ALJ's decision is no longer supported by substantial evidence. *See, e.g., Powell v. Colvin*, No. 3:12-CV-1489-BH, 2013 WL 5433496 (N.D. Tex. 2013); *Lockridge v. Colvin*, No. 3:12-CV-4135-BN, 2014 WL 1255745 (N.D. Tex. 2014); *Quintanilla v. Colvin*, No. EP-12-cv-00444-RFC, 2014 WL 1319298 (W.D. Tex. 2014); *Rudd v. Colvin*, No. 4:14-CV-104, 2015 WL 5719615, at *4 (E.D. Tex. Sept. 28, 2015).

In her psychological evaluation of Plaintiff, Dr. Chatain stated that Plaintiff "has a mental illness which prevents him from engaging in employment for at least six to twelve months." (R. at 987.)  As previously noted, the sole responsibility for determining disability rests with the ALJ. *Newton*, 209 F.3d at 455; *see* 20 C.F.R. §§ 404.1527(d), 416.927(d). Because this is not a "medical opinion," her statement is not entitled to any "special significance." *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (physician's opinion that a claimant is "disabled" or "unable to work" is not the type of doctor's opinion that is ever given "special significance" because it is legal conclusion reserved to the Commissioner.)

Similarly, Dr. Chatain's treatment notes do not raise a reasonable probability that they would have changed the outcome of the disability determination.  She never reported that Plaintiff had memory issues or exhibited an inability to understand her questions or the dialogue between them. (R. at 966-87.) She observed that his mood was typically either somber or depressed, but those moods did not interfere with his ability to understand and communicate. Rather, Dr. Chatain reported that Plaintiff "takes time to explain himself" or to "get to the point" and is "hesitant to disclose things." (R. at 969.)  She also noted that he was "insightful" in at least two of her sessions with him and that his progress was good in the majority of sessions. (R. at 970-71, 979-82.) Accordingly, the substance of Dr. Chatain's treatment notes are consistent with the records upon which the ALJ relied in making his severity determination.  The Allied records do not raise a reasonable probability that the ALJ would have reached a different outcome, and they are therefore immaterial.

### 2.      Pecan Valley

The Pecan Valley documents consist of a multiaxial diagnostic assessment conducted on

19

August 28, 2014, and progress notes from August 6, 2014 to September 9, 2014.[10] (R. at 8-31.)
Plaintiff also completed a medical history form on August 28, 2014. (R. at 13-14.)  The Appeals
Council did not consider these records. (R. at 1-2.)  It stated in its notice denying Plaintiff's request
for review:

> We also looked at the medical evidence from Pecan Valley Centers dated August 6,
> 2014 through September 9, 2014. The Administrative Law Judge decided your case
> through December 18, 2013. *This new information is about a later time*. Therefore
> it does not affect the decision about whether you were disabled beginning on or
> before December 18, 2013.

(*Id*. at 2) (emphasis added).

Generally, "the Commissioner need 'not concern evidence of later-acquired disability or of
the subsequent deterioration of the previously nondisabling condition,' " because they fail to meet
the materiality requirement. *Powell v. Colvin*, No. 3:12-CV-1489-BH, 2013 WL 5433496, at *11
n.9 (N.D. Tex. 2013) (quoting *Johnson v. Heckler*, 767 F.2d 180, 183 (5th Cir. 1985).  Post-dated
records may meet the first prong of materiality, however, as long as the records relate to the time
period for which disability benefits were denied. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995)
(holding that new evidence of scar tissue related to the adjudicative period because it resulted from
a prior surgery).

Here, the medical records post-date the ALJ's decision, as noted by the Appeals Council.
(*See* R. at 1-31.)  Plaintiff argues that the Pecan Valley records relate to the adjudicative period
"because they include diagnoses of 'recurrent' major depressive disorder, a 'past' GAF score of 50,
and a 'history of aggression.' " (doc. 18 at 5.) (internal citations omitted).  The fact that Plaintiff was
diagnosed with major depressive disorder and had a history of aggression is not new, however.

---

[10]   In his brief, Plaintiff identifies this date as September 9, 2011. (doc. 16 at 16.)  However, the document
reflects a date of September 9, 2014. (R. at 10.)

Diagnoses of a major depressive disorder, mood disorder, and bipolar disorder are scattered throughout the record, and the ALJ took notice of these diagnoses. (R. at 40, 61-62.)  Likewise, a history of aggression and irritability are also seen throughout the record and are related to his diagnoses of bipolar and mood disorders.  While the GAF score of 50 may be new evidence, "a low GAF score is not determinative of a disability" and "the ALJ is not bound to consider its results." *Nickerson v. Astrue*, No. 3-07-cv-0921-BD, 2009 WL 321298, at *5 (N.D. Tex. Feb. 6, 2009) (citing *Sambula v. Barnhart*, 285 F. Supp. 2d 815, 825 (S.D. Tex.2002); *Alvarez v. Barnhart*, No. SA–01–CA–0958–FBN, 2002 WL 31466411, at *8 (W.D. Tex. Oct. 2, 2002); *Glover v. Massanari*, No. 3–00–CV–2088–AH, 2001 WL 1112351, at *7 (N.D. Tex. Sept.14, 2001)).  Accordingly, the Pecan Valley records simply reiterate evidence available through other sources.  At most, these records are evidence of a subsequent deterioration of a previously non-disabling condition. "Remand is not appropriate 'solely for the consideration of evidence of a subsequent deterioration of what was correctly held to be a non-disabling condition.' " *Hamilton-Provost v. Colvin*, 605 F. App'x 233, 239 (5th Cir. 2015) (quoting *Johnson*, 767 F.2d at 183 (noting that "subsequent deterioration, however, may form the basis for a new claim")).

Plaintiff relies on *Brown v. Barnhart*, 285 F. Supp. 2d. 919 (S.D. Tex. 2003).  In *Brown*, subsequent hospitalization records were deemed material because they provided further evidence of the nature and severity of the claimant's depression, which predated the ALJ decision. *Id.* at 934. However, the records showed a new diagnosis of bipolar disorder that had not been illustrated by other sources in the record. *Id.* at 935.  Here, Plaintiff presents evidence of his alleged impairments that were in the same condition at the time of the hearing or, at most, a subsequent deterioration of previously non-disabling conditions.  Accordingly, the Pecan Valley records are immaterial and

remand to the agency on these grounds is not appropriate.

Reviewing the record as a whole, the new evidence did not dilute the record to the extent that the ALJ's decision became insufficiently supported.  It was not inconsistent with the ALJ's finding that Plaintiff's mental impairment was not severe and that he could perform jobs that existed in significant numbers in the economy. *See Pope v. Colvin*, No. 4:13–CV–473–Y, 2014 WL 1724766, at *5 (N.D. Tex. May 1, 2014) (finding that the new evidence showing a new diagnosis of macular edema did not dilute the record when there was no evidence that such impairment impacted the claimant's ability to work); *see also Morton*, 2011 WL 2455566, at *7 (stating that if, "in light of the new evidence, the [ALJ's] findings are still supported by substantial evidence," the Court must affirm the Commissioner's decision.).

D.      **Duty to Develop the Record**

Plaintiff next argues that the ALJ failed to develop the record by not ordering the production of the medical evidence from Allied and Pecan Valley. (doc. 16 at 24.)

An ALJ has a duty to fully and fairly develop the facts relative to a claim for benefits. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (citing *Ripley*, 67 F.3d at 557). When the ALJ fails in this duty, he does not have before him sufficient facts upon which to make an informed decision, and his decision is not supported by substantial evidence. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir.1996); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir.1984).  For this reason, a reviewing court may reverse the ALJ's decision if the claimant can show that "(1) the ALJ failed to fulfill his duty to develop the record adequately and (2) that failure prejudiced the plaintiff." *Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012).  However, the duty to obtain medical records generally belongs to the claimant. *See Gonzalez v. Barnhart*, 51 F. App'x 484 (5th Cir. 2002); *Hawkins*, 2011

WL 1107205, at *7.

Under the social security regulations, an ALJ is required to re-contact a medical source only "[w]hen the evidence . . . from [the] treating physician or psychologist or other medical source is inadequate for [the Commissioner] to determine whether [the claimant is] disabled." *Cornett v. Astrue*, 261 F. App'x 644, 648 (5th Cir. 2008) (quoting 20 C.F.R. § 416.912(e)).  As to a treating physician specifically, if the Commissioner determines that a treating physician's records are inconclusive or are otherwise inadequate to receive controlling weight, absent other medical opinion evidence by an examining or treating physician, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e). *Newton*, 209 F.3d at 457.

### 1.       Allied Mental Health

Plaintiff argues that the ALJ knew about the Allied medical records and had a duty to obtain them. (doc. 16 at 21.)  Specifically, he argues that "[t]he ALJ was informed that . . . Counsel [for Plaintiff] had attempted to obtain those records but was unsuccessful." (doc. 16 at 24.)

The Fifth Circuit recently rejected the argument that an ALJ had a duty to obtain all of a plaintiff's medical records before reaching a decision in *Sun v. Colvin*, 793 F.3d 502, 509 (5th Cir. 2015).  It reaffirmed that the ALJ's duty is "one of developing all relevant facts, *not collecting all existing records*." *Id.* (emphasis added and internal quotations omitted) (citing *Castillo v. Barnhart*, 325 F.3d 550, 552-53 (5th Cir. 2003) (per curiam)  It further explained that the duty to develop the record can be effectuated by the ALJ's questioning of the claimant regarding his education, training, past work history, the circumstances of his injury, daily routine, pain, and physical limitations and given an opportunity to add anything else to the record. *Id.* ("Consistent with that description, the

court often focuses on the ALJ's questioning of the claimant in order to determine whether the ALJ gathered the information necessary to make a disability determination.") (citing *Castillo*, 325 F.3d at 552-53; *Brock*, 84 F.3d at 728).

Here, there is no indication that the medical records before the ALJ were inadequate or that he lacked sufficient facts to make a determination. Even if certain aspects of Plaintiff's medical history was not included in the medical record, that information was further developed by the ALJ at the hearing. (*See* R. 54-99.) The ALJ thoroughly went through Plaintiff's past work experience and training (R. at 65-74), his education (R. at 74), his leisure activities (R. at 75), his medication (R. at 75-76), the circumstances of his current health (R. at 76-77, 79-82), his daily activities (R. at 82-84), and gave Plaintiff an opportunity to explain why he thought he could not work a full-time job (R. at 81). Accordingly, the ALJ fulfilled his duty to fully and fairly develop the record.

## 2.   Pecan Valley

Although Plaintiff argues that the ALJ's duty extended to the records from Pecan Valley (doc. 16 at 24), he makes no argument as to why the ALJ had a duty to obtain records *not yet in existence*. As noted, the ALJ's duty is to develop facts, not collect medical records. *Sun*, 793 F.3d at 509. Here, there is no indication that the ALJ found the evidence in the record inconclusive or otherwise inadequate to render a decision. *See, e.g., Cornett*, 261 F. App'x at 648; *Newton*, 209 F.3d at 457. Additionally, to the extent that any information was lacking, that information was further developed by the ALJ at the hearing. (*See* R. 54-99.) Accordingly, the ALJ fulfilled his duty to fully and fairly develop the record.

### III.  CONCLUSION

The Commissioner's decision is **AFFIRMED**.[11]

**SO ORDERED** on this 31st day of March, 2016.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[11]  To the extent that Plaintiff argues that the ALJ from Missouri applied an incorrect standard for severity because he did not apply the standard identified in *Stone v. Heckler*, 752 F.3d 552 (5th Cir. 1985), (doc. 16 at 19 n.6), this issue was not listed or briefed separately as required by the Scheduling Order issued on March 11, 2015 (doc. 15), and it is therefore waived.